UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――――――――

WILLIAM D. WEHR-DARROCA,
Washington, D.C. 20009;

GARY STEMPLE,
Washington, D.C. 20024; *and*

FIREARMS POLICY COALITION, INC.
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149,                                    Civil Action No.:

                    Plaintiffs,

         v.

THE DISTRICT OF COLUMBIA;

PAMELA A. SMITH, in her official capacity as
Chief of the Metropolitan Police Department of the District
of Columbia, 300 Indiana Avenue NW, Washington, DC 20001;
*and*

BRIAN L. SCHWALB, in his official capacity as
Attorney General for the District of Columbia,
400 6th Street, NW, Washington, DC 20001,

                    Defendants.

―――――――――――――――――――――――――――――――

## **COMPLAINT**

        Plaintiffs William D. Wehr-Darroca; Gary Stemple; and Firearms Policy Coalition, Inc.

("FPC"), by and through counsel of record, bring this Complaint against Defendants District of

Columbia ("the District"), Chief Pamela A. Smith, and Attorney General Brian L. Schwalb, for

their infringement on the right of law-abiding, peaceable residents of the District to keep and bear

commonly owned arms for defense of self and family and for all other lawful purposes—in this

case standard capacity magazines, which the District misleadingly labels "large capacity ammunition feeding device[s]"—and allege as follows:

## INTRODUCTION

1.     The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms."  U.S. CONST. amend. II.  As protected by this constitutional provision, Plaintiffs, and other law-abiding, peaceable residents of the District, have a fundamental, constitutionally guaranteed right to keep common arms for defense of self and family and for other lawful pursuits.

2.     Despite this guarantee, Defendants have enacted and enforced a flat prohibition on the sale and/or possession of common, standard capacity magazines capable of holding more than 10 rounds of ammunition (the "Ban").  D.C. Code §§ 7-2506.01(b); 7-2507.06(a)(4); 223571.01(b)(6).

3.     The District's Ban, and Defendants' enforcement thereof, denies individuals who reside in the District, including the individual Plaintiffs and Plaintiff Firearms Policy Coalition, Inc.'s ("FPC") similarly situated members, of their fundamental, individual right to keep and bear common arms.

4.     Standard capacity magazines do not give rise to "unprecedented lethality."  The modern variants have been widely available and commonly used for at least 100 years, if not longer.  Nor are they "uncommonly dangerous."  More than 700 million of them have been produced and sold over the past 30 years, and at least 40 states have no restrictions at all on magazine capacity.  Standard magazines are common in all respects.  And they by no means constitute a "dramatic technological change," because they emerged through incremental technological improvements over the past 500 years, culminating in the essential modern features

2

more than a century ago.  More, the illegal use of protected arms to harm others is not an "unprecedented societal concern," but was known to the Founders and Framers at the time of Ratification, and cannot overcome that these magazines are constitutionally protected and are overwhelmingly used by law-abiding citizens for lawful purposes.

5.      In essence, the trend in incremental technological development has always been toward increased firearm capacity, balanced against reliability, accuracy, portability, and ergonomics.  Over the past several centuries, this has led to the current status quo, relatively unchanged since the 1960s, where a majority of handgun magazines have a capacity in excess of ten rounds, and nearly half of all magazines in use today are rifle magazines with a 30+ round capacity.

6.      Although irrelevant to the constitutional analysis, there are many sound reasons why the average individual would want to use magazines that accept more than 10 rounds.  Most obviously, a law-abiding citizen would not want to run out of ammunition and be forced to reload while under criminal attack, which could involve multiple assailants, an assailant using a magazine containing more than 10 rounds, or an assailant using multiple firearms.  Given the stressful and often-unexpected nature of such encounters, forcing the victim to reload puts her at a significant disadvantage relative to her assailant.  Moreover, criminals have plenty of time to prepare for their assault; peaceable individuals must respond in the moment.

7.      Standard capacity magazines are also important for ordinary citizen self-defense because most shots fired in armed altercations miss their target.  Professional police, who are trained and must regularly practice with their firearms, miss their targets more often than not.  In a fourteen-year study of the Dallas Police Department, for example, officers achieved an accuracy rate of just 35%, and half of all Dallas officers missed *every* shot they fired.  Christopher M.

Donner and Nicole Popovich, Hitting (or missing) the mark: An examination of police shooting accuracy in officer-involved shooting incidents, *Policing: An International Journal* 42, no. 3 (2019), https://bit.ly/3LrpoJC.  An ordinary citizen forced to defend herself suddenly is not likely to have a higher accuracy rate than professional police officers would.

8.     As an example, Susan Gonzalez, a Jacksonville resident, was severely limited in her ability to defend herself by the size of her handgun's magazine.  She was shot in the chest one evening when two armed men broke into her home.  She retreated to her bedroom and found her husband's .22 pistol.  After firing warning shots, she shot at one of the two men and hit him twice with her seven or eight remaining bullets.  Out of ammunition and unable to reload, she was shot once more by the other gunman, who proceeded to put his gun to her head and demand the keys to the couple's truck.  *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1130–31 (S.D. Cal. 2017).

9.     By contrast, a homeowner in Houston successfully fended off five home invaders after firing at least a dozen shots in self-defense.  Katherine Marchand, *5 shot and 3 killed after homeowner opens fire on suspects in east Houston*, ABC13 (Jan. 20, 2019), https://abc13.co/2EYq0ag.

10.     Unlike law-abiding citizens, violent criminals are not meaningfully constrained by the District's Ban.  Given the hundreds of millions of standard capacity magazines in circulation in the country, it is not difficult for violent criminals to acquire them through illegal sales or importation despite the District's Ban.  And unlike law-abiding citizens, violent criminals will have no compunction about violating the Ban.  Even if violent criminals were effectively prevented from acquiring banned magazines, they could easily compensate by bringing multiple firearms or magazines with them to the scene of the crime.  Their ability to do so is made possible by the fact

that violent criminals, and not their law-abiding victims, choose the time and place of crimes and can plan accordingly.

11.    In addition to their obvious advantages for self-defense, standard capacity magazines are also preferred for other lawful activities, such as recreational and competitive shooting.  Standard capacity magazines reduce the frequency of changing magazines, reduce the need to purchase as many magazines, and are in general superior.

12.    Absent relief from this Court, Defendants will continue to violate the constitutionally protected rights of the District's law-abiding citizens and reinforce the erroneous notion that the right to keep and bear arms is nothing more than "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343.

14.    Plaintiffs seek remedies under 28 U.S.C. §§ 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

15.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (b)(2).

## PARTIES

16.    Plaintiff William Wehr-Darroca is a natural person, a resident of the District, an adult over the age of 21, and a citizen of the United States.  Plaintiff Wehr-Darroca is legally eligible under federal law to possess and acquire firearms, is eligible to register firearms in the District, and has registered firearms in the District.  Plaintiff Wehr-Darroca is a member of FPC.

17.    Plaintiff Gary Stemple is a natural person, a resident of the District, an adult over the age of 21, and a citizen of the United States.  Plaintiff Stemple is legally eligible under federal law to possess and acquire firearms, is eligible to register firearms in the District, and has registered firearms in the District.  Plaintiff Stemple is a member of FPC.

18.    Plaintiff FPC is a nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada.  FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms.  It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and protect, defend, and advance the means by which individuals may exercise the right to carry, possess, and use firearms.  FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.  FPC's members reside both within and outside the District.

19.    FPC brings this action on behalf of its members, including the named Plaintiffs herein, who are injured by the operation and enforcement of the District's Ban.

20.    Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States.

21.    Defendant Pamela A. Smith is acting Chief of Police of the Metropolitan Police Department of the District of Columbia, and as such is responsible for executing and administering the District's laws, customs, practices, and policies.  In that capacity, Defendant Smith is presently enforcing the unconstitutional laws, customs, practices and policies complained of in this action.  Her official address is the Metropolitan Police Headquarters, 300 Indiana Avenue NW, Washington, DC 20001.  Defendant Smith is being sued in her official capacity.

22.     Defendant Brian L. Schwalb is the Attorney General for the District of Columbia, and as such is responsible for executing and administering the District's laws, customs, practices, and policies.  In that capacity, Defendant Schwalb is presently enforcing the unconstitutional laws, customs, practices and policies complained of in this action.  His official address is 400 6th Street, NW, Washington, DC 20001.  Defendant Schwalb is being sued in his official capacity.

## THE DISTRICT'S MAGAZINE BAN

23.     The District has criminalized firearms magazines capable of holding more than 10 rounds:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm.  For purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.  The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

D.C. Code §§ 7-2506.01(b).  Violation of the Ban is punishable by up to three years in prison and a fine of up to $12,500.  D.C. Code §§ 7-2507.06(a)(4); 223571.01(b)(6).

## THE BAN IS UNCONSTITUTIONAL

24.     The Second Amendment to the United States Constitution provides:  "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."  U.S. CONST. amend. II.

25.     "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *D.C. v. Heller*, 554 U.S. 570, 634 (2008) (emphasis in original).

I.      **The Supreme Court in *Bruen* reaffirmed *Heller*'s text and history test for assessing the constitutionality of firearms regulations**

26.     The D.C. Circuit previously upheld the laws at issue against a Second Amendment challenge, applying intermediate scrutiny.  *Heller v. D.C.*, 670 F.3d 1244, 1261–64 (D.C. Cir. 2011) ("*Heller II*") ("In short, the evidence demonstrates a ban on [so-called large capacity magazines] is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia.").  *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), however, abrogated that decision, and reaffirmed the applicability of the test articulated in *Heller*.

27.     In *Bruen*, the Court rejected the two-step approach applied in *Heller II* as "one step too many" and held that the appropriate standard for applying the Second Amendment is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 19, 23–24.  The Supreme Court further held:  "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.  Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 19.  "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history."  *Id.*

28.     *Bruen* did not create a new test, but instead reiterated and applied the test the Court established in *Heller*.  "The test that [the Court] set forth in *Heller* and appl[ies] today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's

text and historical understanding." *Bruen*, 597 U.S. at 26. "*Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 22.

## II.    The plain text of the Second Amendment covers standard capacity magazines

29.    Beginning with the initial textual analysis set forth in *Heller* and reiterated in *Bruen*, the plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in here— to "keep and bear" standard capacity magazines—because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 597 U.S. at 28.

30.    Magazines are necessary for the operation of semi-automatic firearms, therefore they are "arms," because "to hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level . . . ." *Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024).

31.    Where, as here, "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## III.    The District cannot meet its burden of demonstrating that the Ban is consistent with this Nation's tradition of firearms regulation

32.    To justify a modern law that impairs Plaintiffs' Second Amendment protected rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition. *Bruen*, 597 U.S. at 19–21.

33.     *Heller* already established the relevant historical tradition for arms ban cases: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* "dangerous *and* unusual."  554 U.S. at 627 (emphasis added).  Arms that are "in common use at the time"—such as the standard capacity magazines banned by the District—are not both "dangerous and unusual" so they cannot be banned.  *Id.*

34.     As a matter of law, any regulation that bans ownership of arms in common use for lawful purposes, including but not limited to self-defense, is inconsistent with this Nation's history of firearms regulation (which permits only banning "dangerous and unusual" weapons not commonly used by law-abiding citizens), and thus violates the Second Amendment.  *Id.* at 21; *Heller*, 554 U.S. at 624, 627.[1]

**A.     The District unconstitutionally bans magazines that are in common use**

35.     Because the District bans arms in common use today by law-abiding citizens, the Ban violates the Second Amendment.  The magazines at issue in this case are not "dangerous and unusual," but instead are standard components of firearms in common use for lawful purposes that law-abiding Americans possess by the hundreds of millions.

36.     Although the Ban describes magazines that can accept more than 10 rounds of ammunition as "large-capacity," this is a misnomer.  Magazines capable of holding more than 10 rounds of ammunition are a normal, factory feature and are more accurately described as "standard capacity magazines."

---

[1]     In *Hanson*, the D.C. Circuit commented on what it perceived to be a lack of consensus about whether *Heller*'s common-use test should be part of the plain text analysis , or instead should be part of the historical analysis.  120 F.4th at 232 n.3.  The *Hanson* court "assume[d], without deciding" that it is part of the textual analysis.  *Id.*  Plaintiffs, by contrast, note that the Supreme Court has made clear that it is part of the historical analysis.  *Heller* specifically makes clear that the common-use test derives from the "**historical tradition** of prohibiting the carrying of dangerous and unusual weapons."  *Heller*, 554 U.S. at 627 (emphasis added).

37.     A recent study found that of the "963 million magazines [that] were produced and entered the commercial market between 1990 and 2021," "approximately 74 percent, or 717 million magazines, have a capacity of 11+ rounds."  Nat'l Shooting Sports Found., Inc., *Detachable      Magazine      Report      1990-2021*      (2024),      at      2, https://nssfresearch.s3.amazonaws.com/Detachable-Magazine-NSSFReport.pdf.

38.     Today, semi-automatic handguns are typically designed to operate with magazines capable of holding more than 10 rounds.  The popular Glock 19 is shipped with a standard 15-round magazine.  Sig Sauer's full-size P320 is shipped with a standard 17-round magazine.  Sig Sauer's compact P320 ships with a standard 15-round magazine.  And even Sig Sauer's micro-compact P365 (which Sig Sauer deems "America's #1 selling handgun") ships with a standard 12-round magazine.

39.     It is estimated that more than 209 million handgun magazines capable of holding more than 10 rounds entered the commercial market from 1990 and 2021, which is a majority of all handgun magazines produced and sold during that period.  *Id.*  Magazine capacity of more than 10 rounds is standard for handguns.

40.     And magazines holding 30 rounds are standard for the AR-15 and similar semiautomatic rifles.  AR-15-style rifles are among the most popular firearms in the nation, owned by millions of Americans.  Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces   Over   24   Million   MSRs   in   Circulation*   (July   20,   2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/; *Poll of current gun owners* at 1, WASH. POST-IPSOS (2022), https://bit.ly/46CqzRa (estimating that "about 16 million Americans own an AR-15"); *see also* Emily Guskin, *Why do Americans own AR-15s*, WASH. POST (March 27, 2023), https://wapo.st/3IDZG5I.

41.     Indeed, about 46 percent of *all* detachable magazines in the commercial market from 1990 to 2021 were "rifle magazines with 30+ round capacity," which is more than 448 million magazines.  Nat'l Shooting Sports Found., Inc., *Detachable Magazine Report 1990-2021* (2024), at 2.

42.     The standard magazines banned by the District are not just numerically common (717 million entered the market between 1990 and 2021), they are jurisdictionally common throughout the country:  40 states do not impose any restrictions on magazine capacity.

43.     The ubiquity of standard capacity magazines among law-abiding Americans demonstrates that they are useful for lawful purposes including but not limited to self-defense, hunting, recreational, and competitive shooting.  Because standard capacity are common in all senses of the word, they are per se not both "dangerous and unusual" and cannot be banned.

**B.      Standard capacity magazines are not a recent, dramatic technological change capable of unprecedented lethality**

44.     History demonstrates the prevalence of firearms capable of firing more than 10 rounds without reloading, and the incremental development of modern magazines over the past five centuries, and yet there is no historical prohibition remotely similar to the District's Ban.

45.     In line with the widespread possession and use of standard capacity magazines for lawful purposes, there is no historical tradition of prohibiting the possession, purchase, transfer, manufacture, or sale of such magazines.  Magazine bans were unknown in the United States before the 20th century, despite the popularity of guns like Winchester's "sixteen shooters."  Bans like the District's are recent phenomena—indeed, until the Ban was put in place, the District did not

restrict possessing, purchasing, manufacturing, transferring, or selling standard capacity magazines.[2]

46.    This is true even though firearms capable of holding multiple rounds have existed since the late 15th century, and firearms capable of firing 10 or more rounds without reloading have existed at least since the late 16th century.  *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852–53 (2015) ("The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using 'superposed' loads (each round stacked on top of the other).").

47.    Multiple round firearm technology quickly developed from multi-shot wheel lock rifles to repeating, magazine-fed rifles, with the English military employing magazine-fed repeating firearms as early as 1658.  Clayton E. Cramer & Joseph E. Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008) (citing A. V. B. NORMAN & DON POTTINGER, ENGLISH WEAPONS & WARFARE: 449–1660, 206–07 (1979)).  The now famous "Puckle Gun," or "Defence Gun," was patented by James Puckle in 1718 in England and operated using "a Sett of Chambers ready Charg'd to be Slip'd on when the first Sett are pull'd

---

[2]    In *Hanson*, the D.C. Circuit rejected the District's proposed historical analogue of gunpowder storage restrictions as "silly"; rejected various time, place, and manner restrictions as insufficiently analogous, *id.* at 235–36; and distinguished Prohibition-era capacity limits for automatic weapon magazines, *id.* at 236–37.  But the Circuit identified a potentially applicable historical tradition of regulating weapons of "unprecedented lethality" emerging from "dramatic technological change," with the Bowie knife, sawed-off shotgun, and machine gun as examples, which the Circuit posited might save the District's ban.  *Id.* at 237–43.  Because *Hanson* was decided at the preliminary injunction stage, however, the court made clear that "[o]n a more developed record, evidence disputing the linkage between ECLMs and mass shootings may render inapposite the tradition of banning weapons capable of unprecedented lethality."  *Id.* at 240. Plaintiffs contend that the record here will demonstrate that this historical analogue is indeed inapposite, for multiple reasons, including but not limited to the fact that the Circuit-posited "lethality" of standard capacity magazines is not unprecedented, the linkage with mass shootings is tenuous and would be irrelevant even if it were not, and standard capacity magazines did not emerge from dramatic technological change.

off to be recharg'd."  U.K. Patent No. 418 (filed May 15, 1718) https://bit.ly/3t5UGzu; CHARLES

FOULKES, THE GUN-FOUNDERS OF ENGLAND: WITH A LIST OF ENGLISH AND CONTINENTAL GUN-

FOUNDERS FROM THE XIV TO THE XIX CENTURIES 32–33 (1937).

48.    Firearms capable of firing multiple rounds without reloading were well known to

the Founding generation.  In 1777, Joseph Belton demonstrated a repeating rifle that could hold

16 rounds of ammunition to members of the Continental Congress.  Robert Held, THE BELTON

SYSTEMS, 1758 & 1784-86: AMERICA'S FIRST REPEATING FIREARMS 37 (1986).  Belton also

informed Congress that he could equip his rifle with as many as 20 rounds at a time. *Id.* at 17.  As

another example, Meriwether Lewis carried a Girandoni air rifle, with a 22-round tubular, spring-

loaded magazine on his famous expedition with William Clark.  James B. Garry, WEAPONS OF THE

LEWIS AND CLARK EXPEDITION 100–01 (2012).

49.    While the District may attempt to argue that these earlier firearms were never in

common use, "repeater" firearms were extremely popular in the 19th century and came in many

forms.  The New York Evening Post in 1821 lauded Isaiah Jennings for inventing a repeater

"important[t] for both public and private use," whose "number of charges may be extended to

fifteen or even twenty." *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, in 59

Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL COMPREHENDING THE VARIOUS

BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES,

AND COMMERCE 467–68 (Richard Taylor ed., 1822).

50.    Around the time of the Civil War, multi-round rifles became commonplace. The

16-shot Henry Rifle, invented in 1861, was very popular.  Soon after, in 1866, the extremely

popular Winchester Model 1866 rifle was first produced, and the standard model could hold 15

rounds in the magazine with one more in the chamber. *See* Norm Flayderman, FLAYDERMAN'S

GUIDE TO ANTIQUE FIREARMS AND THEIR VALUES 268 (6th ed. 1994).  The Winchester 1866 was soon followed by the Winchester 1873, deemed "the gun that won the West," also with a standard 15-round magazine.  As a result, standard capacity magazines were commonly possessed in the 1860s, 130 years before attempts to strictly regulate them would come along.  Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. at 871.

51.     Even if the Court determines there were "dramatic technological changes" in the realm of magazine development leading to widespread adoption of standard capacity magazines— rather than the incremental changes evidenced by centuries of advancements—such changes occurred more than 100 years ago, and are insufficient to support the District's Ban on them so long after the fact.

52.      Further, the Second Amendment's "reference to 'arms' does not apply only [to] those arms in existence in the 18th century."  *Bruen*, 597 U.S. at 28 (cleaned up).  Indeed, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted).

**C.     Perceived societal concern does not render the Ban constitutional**

53.     Proponents of bans like the District's Ban often seek to justify them based on a concern with public mass shooting events.  But "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  Pointing to the illegal and despicable use of firearms to harm innocent people does not demonstrate a historical tradition of regulation.  In fact, violence perpetuated with

firearms is not a new phenomenon to this Nation.  Our Founders and Framers recognized that the answer to that violence was not mass disarmament, but rather protecting peaceable, law-abiding individuals' right to possess the arms necessary to effectuate their own defense.

54.    Moreover, mass shootings represent an extremely small subset of all violent crime committed with a gun, and mass shootings involving firearms that feature magazines holding more than 10 rounds are an even smaller subset still.  *See* Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND (April 15, 2021), https://bit.ly/3MRkTtu ("Mass shootings are tragic, traumatic, and shocking events . . . .  However, they represent a very small fraction of the homicides in the United States.").

55.    In fact, from 1976 through 2018, an average of just 26 people were killed per year in public mass shootings (defined as "incidents that occur in the absence of other criminal activity (*e.g.*, robberies, drug deals, and gang 'turf wars') in which a gun was used to kill four or more victims in a public location within a 24-hour period").  Grant Duwe, *Patterns and prevalence of lethal mass violence*, 2019 J. CRIM. & PUB. POL'Y 1, 12 (2019).  That is lower than the number of individuals (43) killed each year by lightning strikes (1989-2018) and significantly lower than the annual number of people injured by lightning strikes (243).  *How Dangerous is Lightning?*, NAT'L WEATHER SERV., https://bit.ly/3wN3iNU.  Furthermore, there is no convincing empirical evidence that the District's Magazine Ban will have any impact at all on mass shootings.  *See* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, NAT'L INST. OF  JUST., U.S. DEP'T OF JUST. at 81 n.95, https://bit.ly/3NDzBUK (explaining that "it is hard to draw definitive conclusions" about the effectiveness of state assault weapons bans in part because "the impact of [such] laws is likely undermined to some degree by the influx of [assault weapons] from other states").

56.     Moreover, and even though it is not a burden assumed by the Plaintiffs here nor the basis for a defense available to Defendants, there is no reliable proof that restrictions on new manufacturing or sales of standard capacity magazines will reduce violence involving firearms. Between 1994 and 2004, federal law prohibited possession or transfer of magazines holding more than 10 rounds of ammunition (though it exempted magazines lawfully possessed before the law's enactment).  A report prepared for the U.S. Department of Justice assessing the effectiveness of the law concluded:  "[W]e cannot clearly credit the ban with any of the nation's recent drop in gun violence," and "there has been no discernible reduction in the lethality and injuriousness of gun violence."  *Id.* at 96.  What is more, due to the porousness of state borders there is even less reason to think that a District-level ban would be effective in reducing violence.  *See id.* at 81 n.95.

57.     In any event, because *Bruen* expressly rejected means-end interest-balancing inquiries in Second Amendment cases, the purported justifications or objectives of the District in connection with passing and enforcing the Ban are immaterial and entitled to no deference from this Court.

*  *  *  *  *

58.     The Second Amendment is an "unqualified command."  *Bruen*, 597 U.S. at 24. When a law—like the District's Ban at issue here—prevents citizens from owning arms that are in common use for lawful purposes, then the law violates the Second Amendment.  *Id.* at 23-24; *Heller*, 554 U.S. at 627.  It cannot be justified by reference to any countervailing governmental interest.  *Bruen*, 597 U.S. at 23–24.

59.     "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."  *Heller*, 554 U.S. at 634–35.

60.     The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Id.* at 636.  Yet, this is precisely how the District's Ban operates, arbitrarily limiting and disadvantaging law-abiding citizens in the exercise of their fundamental Second Amendment rights in the District.

## PLAINTIFFS ARE INJURED BY THE BAN

61.     Unless and until enjoined, Defendant's active administration, implementation, and enforcement of the District's Ban on the possession, sale, and transfer of so-called "large-capacity" magazines has violated and will continue to violate the Plaintiffs' fundamental, individual right to keep and bear arms.

### I.     Plaintiff Wehr-Darroca is injured by the Ban

62.     Plaintiff Wehr-Darroca lives and works in the District.  He is licensed to carry a concealed weapon within the District (and is also licensed to carry concealed in neighboring states).  He carries a firearm in the District for self-defense, particularly in areas with high crime rates, and keeps firearms in the home for self-defense and other lawful purposes.  He wants to and intends to exercise his right to keep and bear standard capacity magazines in the District, but he cannot do so because of the Ban and the District's threat of enforcement thereof.

63.     Plaintiff Wehr-Darroca owns two handguns that are properly registered with the Metropolitan Police Department ("MPD").  One of his handguns came with three magazines, all capable of holding more than 10 rounds:  an 11-round magazine, a 13-round magazine, and a 15-round magazine, all of which he cannot and has not ever brought into the District.  His other handgun came with three 17-round magazines, again which he cannot and has not ever brought into the District.  Instead of using the factory magazines in the District, he had to separately purchase additional 10-round magazines that are compatible with his registered handguns.

64.     It is Plaintiff Wehr-Darroca's present intention and desire to purchase, possess, and carry standard capacity magazines capable of holding more than 10 rounds of ammunition for use with the firearms he currently owns, and to purchase additional firearms equipped with standard capacity magazines.  He would have done so already but for the Ban.  He is unable to purchase additional magazines or firearms equipped with standard capacity magazines lawfully within the District, because the Ban, and Defendant's enforcement of it, has extinguished the legal market for such hardware in the District and made it unlawful for Plaintiff Wehr-Darroca to import them, manufacture them himself, or possess them in the District.

65.     But for the Ban and Defendant's enforcement of it, Plaintiff Wehr-Darroca would keep and bear standard capacity magazines capable of holding more than 10 rounds of ammunition.

**II.     Plaintiff Stemple is injured by the Ban**

66.     Plaintiff Stemple lives and works in the District.  He is licensed to carry a concealed weapon within the District, and his firearms are properly registered with the Metropolitan Police Department ("MPD").

67.     Plaintiff Stemple keeps a handgun in his home for self-defense and other lawful purposes.  His home-defense handgun came with a standard capacity magazine capable of holding 13 rounds, which he cannot and has not ever brought into the District.  Instead of using the 13-round factory magazine in the District, he purchased an additional 10-round magazine that is compatible with his home-defense handgun.

68.     It is Plaintiff Stemple's present intention and desire to purchase and possess standard 13-round magazines for his home-defense handgun.  He would have done so already but for the Ban.  He is unable to purchase additional standard capacity magazines lawfully within the District, because the Ban, and Defendant's enforcement of it, has extinguished the legal market

for such hardware in the District and made it unlawful for Plaintiff Stemple to import them, manufacture them himself, or possess them in the District.

69.     But for the Ban and Defendant's enforcement of it, Plaintiff Stemple would keep and bear standard capacity magazines for his home-defense handgun capable of holding 13 rounds of ammunition.

* * * * *

70.     That the Plaintiffs have not specifically been threatened with enforcement of the Ban (beyond the threat to the general population embodied in its passage) is immaterial. Plaintiffs, were they to fulfill their intentions to purchase and possess standard capacity magazines in the District, risk being subject to civil penalties and prosecution as soon as they violate the Ban.  *See e.g.*, *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020) (In a pre-enforcement challenge, "[a]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."  Rather, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-159 (2014), which in turn quoted *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

## <u>COUNT ONE</u> - AGAINST ALL DEFENDANTS

**42 U.S.C. § 1983 ACTION FOR DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER THE SECOND AMENDMENT TO THE UNITED STATES CONSTITUTION**

71.     The foregoing paragraphs are incorporated herein as if set forth fully herein.

72.     There is an actual and present controversy between the parties.

73.     The Second Amendment forbids government actions infringing the right to keep and bear arms.   The Second Amendment guarantees ordinary, law-abiding citizens their fundamental right to keep and bear arms, both in the home and in public.

74.     The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, possess, and lawfully use common arms for all lawful purposes, including self-defense, and naturally extends to the parts necessary to operate firearms, including magazines.

75.     The District arbitrarily labels standard capacity magazines capable of holding more than 10 rounds as "large-capacity" magazines and bans them despite the fact that they, along with the firearms with which they are compatible, are in common use for lawful purposes.  More, there is no well-established, representative historical tradition of this sort of firearm regulation in the United States during the relevant time period.

76.     42 U.S.C. § 1983 creates a cause of action against government actors who deprive individuals of federal constitutionally guaranteed rights under color of law.

77.     Defendants, individually and collectively, acting under color of law at all relevant times, have deprived residents of the District, including the individual Plaintiffs and Plaintiff FPC's D.C. resident members, of their fundamental, constitutionally protected rights through Defendants' enforcement of the Ban.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, as follows:

a)    A declaratory judgment that Plaintiffs and Plaintiff FPC's members have a fundamental, constitutionally protected right to keep and bear arms, specifically by acquiring, transferring, and/or possessing common magazines capable of accepting more than 10 rounds of ammunition, as guaranteed by the Second Amendment to the United States Constitution;

b)    A declaratory judgment that the District's Ban and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs and Plaintiff FPC's members from exercising their fundamental right to keep and bear arms guaranteed by the Second Amendment to the United States Constitution, specifically by preventing them from acquiring, transferring, and/or possessing common magazines capable of accepting more than 10 rounds of ammunition;

c)    A permanent injunction prohibiting each Defendant, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing the challenged laws and regulations comprising the District's Ban, and all related laws, regulations, policies, and/or customs used to enforce or implement the same;

d)    Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and

e)    Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated:  Tysons, Virginia
        December 17, 2024

FLUET

By: /s/ *David S. Panzer*
David S. Panzer, Esq. Bar No. 470677
Nicolas J. Rotsko, Esq.*
*Attorneys for Plaintiffs*
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
dpanzer@fluet.law
nrotsko@fluet.law

*Motion for *pro hac vice* admission forthcoming.